Fire and Police Association of Colorado et al. v. Abiomed, Inc. et al. Mr. Egan, I'd like to reserve two minutes for rebuttal at the Court's permission, please. Excuse me? You had better speak up, and yes, you may have two minutes for rebuttal. Thank you. May it please the Court, my name is Patrick Egan. I represent the City of Austin Police Retirement System as well as the Fire and Police Pension Association of Colorado. Plaintiffs below. This is a securities fraud action that involves the simple claims of a company misleading investors by saying one thing and doing another. The allegations in the complaint are that the defendants were telling investors that it was their policy not to off-label market its core product at the time that the defendants themselves were orchestrating and engaged in widespread off-label market promotion. And when the FDA raised the concerns to the company about the off-label promotion, the company responded by telling investors that it was cooperating and working to resolve these few discrete issues. In reality, the company was trivializing the concerns and was continuing to off-label market. Mr. Egan, could you get the microphone a little closer to you? I had the same problem in the last argument. My apologies. That's good. Thank you. So the case involves the Impella 2.5, which is micro heart pump. It's regulated by the FDA. It's cleared for partial circulatory support of up to six hours. It is not approved for any specific procedure or any specific type patient. This is important because it is not approved to be directly marketed for purposes of high-risk PCI, for patients with AMI, or for the company to compare itself to its main competitor, the interaortic balloon pump, and Superior. These were the limitations, and they were crystal clear during the time period. And more than that, these were repeatedly reminded, the defendants were repeatedly reminded of these restrictions by the FDA in letters and in-person meetings. So at all times, the company knew what the approved clearance was, what they could market for, and what they could not. But in the face of the clear restrictions and in face of warnings, repeated warnings from the FDA, the defendants still continued, and even the individual defendants themselves, to off-label market throughout the time period. Now, below, the district court found that the complaint had sufficiently alleged the off-label marketing scheme. It had found that the complaint had adequately alleged that the off-label marketing would affect the stock price, and the plaintiffs have pledged. Let's talk about that, can we? Sure. All right. How much off-label marketing occurred? What's the dollar value? We don't have a dollar value here. So you don't have a dollar value. You don't have, there's nothing I could find in the record that indicates what contributions, if any, off-label marketing made to revenue during the class period. I mean, what I'm struggling with is the notion, how can we tell from this complete abstraction, whether or not off-label marketing, if indeed any occurred, was material to the claimed artificial inflation of the stock price and the consequent drop? Yes, Your Honor. Well, the materiality can be shown in a number of ways. First, to answer your first question, we do not allege specific dollar amounts as to what the off-label marketing was. The device was approved for clearance for limited use. It was not approved for any particular procedure. So when the company sells it, it's very difficult to distinguish, other than the records the company has, as to which sales were made properly and which were made for off-label purposes. I understand that you have difficulties, but particularly in a securities action, you have to make out a plausible claim that the off-label marketing, if it occurred, occurred in sufficient volume that it had a material influence on the company's earnings and thus on the stock price. And I don't know how I can bridge that gap, and I'm asking for some help. Sure, you can bridge that gap by seeing what eventually happened. At the close of the class period, when the company announces, one, that it is being investigated by the U.S. Attorney's Office, two, that it has scrubbed, purged all of its off-label marketing materials, done a massive recall, and three, has taken a reduced guidance. At that period, that year, they were projected to have 45% growth. They scaled that back. They kept the projections at 30%. And what were analysts saying at the time? The analysts were saying, and it's in the complaint, that the reduced expectations were taken into account because they weren't going to be able to as aggressively market for the off-label purposes. And, in fact, the issue here, one of the main issues, is the off-label marketing for high-risk PCI. They are consistently told they cannot do it throughout the class period. They still do it. Counsel, you seem to be suggesting that in place of a materiality requirement, you should just look at the bad things the company is accused of doing, the off-label marketing that perhaps they should not have done. But the off-label marketing, there would be other reasons for the company to engage in this other than attempting to mislead the market. They may want to promote sales. I'm still back to Judge Selye's question, and it's a question the district court coped with and was rather generous to you, in my view. What is the connection between that and stock fraud? Two-fold. First, going to the reaction at the end of the day, the revenue growth for the company started to go down significantly after the massive recall. So while the revenue growth for the Impella was going over time. But the company did not mislead as to what the revenues actually were, whatever the source of it. Correct. They were not challenging the reported revenues in the time period. They were challenging the statements regarding the quality of those revenues. In addition, how this goes to stock fraud is a question in the defendant's site, the Waters case. And there you can look at the analysis. Were the defendants in possession of non-public information? And then the analysis under the proper reckless standard should be, well, was there the risk? Or was it so obvious that they knew the risk that investors weren't told of that? So at the time the company is saying, our policy is we don't off-label market. At the time they say we're cooperating with the FDA. The allegations say internally they were not changing and pulling their marketing materials. They were trivializing it in discussions. So they have the material information. Mr. Minogue himself is on TV, off-label marketing, despite the fact that he had been told repeatedly by the FDA that it was improper, the exact marketing he did. So they know that there's an off-label marketing scheme. That's there. And that is a material fact. And that is known by them. And then the next question is, well, you weren't going and telling the market, we do not off-label market. When they're telling the market, our revenue growth is due to sales and greater utilization in the U.S. But you're not conveying that information.  That their sales growth wasn't due to increased proper utilization of the product. Yes, if we concede all of the bad things you're saying about they knew there was off-label marketing going on, they were attempting to do it, they should have disclosed it. There's still no connection. There's nothing to me that indicates that off-label marketing contributed any significant dollar amount to the revenues of the company. Well, the facts that we allege to show that are, one, that the off-label marketing was not a discreet issue. This was widespread and the confidential witnesses say, particularly for the high-risk PCI, that that was the major focus. But when the company recalls its marketing materials and is no longer off-label marketing, the revenue growth for the impella drops dramatically. It's growing at rates of over 60% compared for quarters prior to the recall of material. It dwindles down to 7% growth a few months later. And then goes back up. And at the point that it dwindles down, that can as well be attributed to the announcement that was made and to the announcement that the U.S. attorney was investigating this, etc. Well, that's as to the stock price. We're just talking about the impella U.S. revenue growth. The impella U.S. revenue growth had dropped down at periods starting with the time of the recall. What I'm saying is those adverse developments not only would affect stock price, but also would be normally expected to affect revenue growth. If I'm buying medical devices for a hospital chain and I read an announcement that the U.S. attorney's office is investigating the practices of one of my suppliers, I'm quite likely, at least until the situation clears up, to switch to other suppliers or to limit my orders. I mean, and you've got a compelling inference standard here, and I'm just not seeing it. Well, when you look at the discussions and the letters to the FDA, with the FDA, and you particularly track them over time, and you see the number of allegations being cited, the language the FDA is using, calling to task, the fact that the confidential witnesses are saying that particularly for high-risk PCI and for comparison to the intra-aortic balloon, that those practices were widespread at the company. These were the materials. You have the CEO himself, in fact, off-label marketing. That shows that there's a momentum for off-label marketing in the company. Those are the allegations that we have. When the company recalls, and it first of all has to recall all of its marketing materials, recertifies its entire sales force, that's a massive move. Once that's done, the revenue doesn't grow. Yes, there's announcements about the U.S. attorney inquiry, but that inquiry is into the improper marketing of the Impella 2.5. An assumption that you're making, I want to make sure that I understand an assumption that you're making, and your assumption, I take it, is that regardless of the intended object of this marketing material, which at least in the first instance are doctors and whatnot who will use the device, that there can be no line drawn between statements made for marketing purposes and statements made to prove the knowing and intentional state of mind as one alternative to proving a 10b-5 violation. I take it the assumption that connects the two in your mind is simply an efficient market assumption. If the information is out, the market knows it. Is my understanding of your assumption correct? I believe our allegations are that the company is off-label marketing,  but the challenge is that the company is telling the market that it is not off-label marketing. It's cooperating with the FDA when there are material risks out there. No, but I'm asking a different question. I'm asking simply the question of the dissemination of what, in fact, is false information, i.e., that they are entitled to go out and market for what is, in fact, off-label. And there's no question that when they do make such statements, those statements will have or the intended effect of those statements will be on people who buy the device. But you are also making the assumption, I think, that that same statement pointed at people who buy devices are statements that are material for proving an intentional state of mind under 10b-5. And I am assuming that what connects those two propositions is an efficient market theory. In other words, if the information is out in the market directed to anybody for any purpose, it is assumed that the entire market, which includes investors, will also know about it. Is that your assumption? I don't believe that's our assumption. The statements regarding the off-label marketing that are put out to the market are one piece of the puzzle. The challenge statements are the statements made in press releases, conference calls, and SEC filings to investors talking about the company's overall policy, talking about the company's dealing with the FDA. The fact that the company was also making public statements, those add to the inference of Scienter in the fact that they undercut what the defendants are saying. So in one part of the 10Q, they may be saying we don't off-label, but in another part they say, here's an example of off-labeling. Does your case depend on the company's statements that they do not engage in off-label marketing? It depends on the statements of their policy regarding off-label marketing and their statements with the FDA, as well as their statements regarding the revenue being attributed to the impella. And if they had not denied doing what you say they do, you would not have a case? If they had not put out, correct, if they had not put out false statements regarding this. May it please the Court, John Donovan for AbioMed. Justice Souter, that assumption is not part of the plaintiff's case. It is not in the complaint. It perhaps should be. If, in fact, statements that are marketing materials have an impact on the market through an efficient market, that might be a case they could bring. It's not the one they did bring. Does it have to be alleged, or is that, in fact, an assumption of law that may be made or should be made? It has to be alleged, Your Honor, because the plaintiff has to articulate precisely what it is that is misleading investors, and that is what he has not done. Just as Judge Celia, you questioned, what is the connection? How does the plaintiff connect the dots between alleged misstatements and any investor fraud? Well, Judge Lynch, you asked the question, is there a distinction really between ostensible misconduct in the marketplace and investor deception? And what you are charged with in this case is making a judgment about whether there was, in fact, investor deception. You cannot tell from this case and from this complaint whether any ostensible misconduct, anything that is said by the plaintiff or even by the FDA to have been improper marketing, off-label marketing, had the effect of producing even one sale. So you cannot say whether one dollar or every dollar of the company's revenue was produced by off-label marketing, raising the question, I think, Judge Lynch, you sort of questioned this, about whether, in fact, there is a misleading statement at all. Ultimately, though, you are charged with making yourselves, under no vote review, weighing the inferences about whether there was an inference of say-enter, an inference of fraud that could arise from what is said to be misleading. So the analytical path I suggest you need to follow is to look at those statements that are claimed to have been misleading and what the plaintiffs say should have been said. Justice Souter, in the derivative case that was brought parallel to this, you wrote the opinion affirming the dismissal of that case, and you noted that on essentially the same record, the company was not shy at all about disclosing the fact that the FDA had raised concerns, the company said it was dealing with them, and the company specifically said, in light of those concerns that the FDA had raised, we are dealing with them, but they pose material risks. We are alerting investors to the risk that if this goes badly, if the FDA disagrees with us that our marketing materials are off-label, then there could be a material adverse consequence to the company, and it could affect our revenue, it could affect our results, and it could affect our financial well-being. Is there a possible alternative route to liability here under the recklessness prong? In other words, let's assume that they cannot prove how many dollars of sales were attributable to, excuse me, an improper indication that this was not off-label use. If, in fact, investors were assuming that substantial sales were attributable to the, in effect, to what we know to be off-label, and then finding out, said, oh, my goodness, I'm going to dump the stock, creating at least a plausible claim of damages, wouldn't the fact that they were putting information in a public place, even if the investors misinterpreted it, be a possible route to a recklessness liability? Precisely the opposite, and let me say why. First, I don't conceive there was off-label marketing at all. These are highly nuanced judgments that the company is engaged back and forth with the FDA about, and that ultimately were resolved in the company's favor. Let's assume for the sake of argument that we will read the complaint to say that they were claiming off-label. So your question gets right to the heart of the scienter analysis. If you were bent on deceiving investors and keeping them in the dark about the risk of FDA action that could affect your sales, or you were reckless, you didn't care, why would you say to investors this risk exists? The FDA has brought these things to our attention. We are dealing with them, and if we are wrong, we could lose. If you didn't care, which is the heart of recklessness, you would never say that. But you're saying that the only recklessness could be the failure to disclose the government's inquiry, but isn't there a separate route of recklessness simply in putting out information, even if the FDA never noticed it, putting out information that investors could know, on the basis of which investors would perhaps naturally assume, gee, they must be selling a lot of these devices for these specific uses, leading to an inflation of the stock price. And if that is a reasonable reaction that investors might make, forget the FDA, isn't that a possible route to a finding of reckless liability? I don't think so. And again, I reject the premise. But if you said that investors must know that this conduct is potentially legal, and you were to do what the plaintiff therefore says and disclose it, take your reckless standard, reverse it, and put it in the plaintiff's words, here's what you should have said, we are engaged in a pervasive campaign, well, then you would have done the exact opposite of what you're required to do. You would have stampeded investors to sell because of this, and in fact, that would have been disastrous. At the time this was brought, the stock price fell to 13. If investors had been stampeded either purposefully or recklessly into selling their stock, they would miss out on the current price of 37. The irony is that also happens when we know that for at least two years, the FDA has concluded that none of this was in fact improper. The FDA issued a closeout letter in February of 2013, so the second year anniversary is next month. We know since then, and probably since before then, in August of 2012, the company had not done anything like this, anything that even got close to the line, much less arguably crossed this, as I say, highly nuanced judgment. Well, if that's true, and everything has been clearly on the up and up since then, and the stock price has continued to soar and the market for Impella has continued to grow, and sales have soared, then how on earth can you justify stampeding investors to have sold two years before by accusing yourself of illegality, or not accusing yourself of illegality and leaving investors with their own devices to figure things out? I take it, I was going to have a further question, and that is, was it error for the district court not to make a finding on the recklessness prong? And I take it your answer to that is, whether or not it was, it was a harmless error at most. It was harmless for two reasons. One, I think he, in effect, did it by saying, by weighing the competing inferences and concluding that Sciento was not established. But in all events, your review is de novo. You have to make the assessment yourselves, and you have to weigh the competing inferences yourselves. So whether he said it or not. Well, that's true, but on an issue which the district court did not pass on, we would certainly be within discretion to say we're a court of review, not first instance, even though it's a de novo review, and send it back for a recklessness finding. You could. I would suggest that would be futile, on the one hand. On the other, if there is any ground that justifies affirming a dismissal, then the law of this circuit, and including in Waters, this court will take it. So I suggest that's what you should do. I know. Imagine, if you will, the consequences as well of holding that the kinds of statement the company was making were, in fact, intentionally or recklessly deceiving investors. As I say, if you are hell-bent on deceiving investors and keeping them in the dark, why on earth would you tell them that these are risks, alert them to what the FDA has said, and say even though you disagree with it, this could be a problem and pose material risks to the company. If you disagree with the FDA, are you then obliged to disclose, as the plaintiff would say, all the gory details, to say everything about what the position the FDA has taken, assume it's true, and alert investors of that? Well, that, frankly, robs the company of any defense to an FDA inquiry on what is, after all, an untitled letter resolved, a warning letter ultimately resolved, and one follow-up letter, which cited nine in three instances over two years specific instances that they said might constitute off-the-label marketing, from which they ultimately all backed away. I think the answer is you tell them those gory details only if it is ultimately inevitable that you will lose. But depriving the company of the ability to interact with its regulator and say we disagree, take a position, and as in this case, get it right, means that if you reverse that assumption, rob the company of that defense, you make every case a right of confession. In assuming that there is not a requirement to set out, as you put it, all the gory details, and you simply disclose that the FDA and we have a disagreement, can an investor who wants to find out what the FDA's position is find out, is that a matter of public record, including the first of the inquiries? At a certain point, it is. At the initial point, it is not. The first letter that was received is a so-called untitled letter. But the warning letter is a public document. The warning letter was a public document and promptly disclosed. And just to take the point one step further, Justice Souter, warning letters are themselves a part of the FDA regulatory hierarchy, the enforcement hierarchy, and this Court has ruled in several cases that even warning letters are not by themselves disclosure events, precisely for the reason I mentioned, that if you require disclosure of warning letters, you rob the regulated entity of the ability to interact with this regulator, to converse with them, discuss with them, and point out they may be wrong, especially if they haven't culminated in actual enforcement action. You're taking the problem the FDA has identified, elevating it into enormous significance, essentially labeling it a violation before any conversation about it has happened, and do what the plaintiffs have done, equate ostensible misconduct with securities law violations. Ultimately, that seems to me the issue. Mr. Donovan, your argument seems to depart a bit from the last question I asked, which is that their case seems to depend on your company's affirmative assertion of the defense that you did no off-label marketing, that if you had not said that, but had merely disclosed the FDA warning letters and said the matters in negotiation, you would have been all right. Is the further statement meant to reassure, I guess, both the market and to reassure the purchasers of this equipment that got you into trouble? That's the plaintiff's argument, and respectfully it's not in the complaint, Your Honor, because that is not the disclosure the company made. The company disclosed the fact of the warning letter and said, quote, although it is our policy not to off-label market, the FDA could disagree. The FDA has raised questions with us. We are dealing with the FDA, and we cannot predict the outcome. And, in fact, we can't predict the outcome won't be materially adverse. That highlights the distinction between this case and a case of investor fraud. The question is always how you distinguish independent misconduct and securities fraud. The federal securities laws are aimed at avoiding investor deception, but they're not a right of confession, and they are not devices to vindicate or cure independent wrongs. That's what the plaintiff's case problem is. It attempts to solve for ostensible off-label marketing, not for securities fraud. To stampede investors into the wrong result would be a real perversion of securities laws. On that basis, this Court should affirm. Thank you. Thank you, Your Honor. Just to touch on a few items. First, the question raised by counsel of if you didn't care, why would you say anything? The reason the company said anything in the first place is the warning letter that came out in June of 2011 was made public by the FDA. Well, of course they had to say something at that point. Correct. But go on. What's your next point? So the question is once they've then made it public, they just need to make statements that are truthful. They went on to make representations about what their policy was for off-label marketing. We submit that the facts about what the defendants did in their knowledge and what the confidential witnesses say is that the off-label marketing was going on at that time and that in response to the FDA's repeated inquiries, materials were not changed, things were not pulled until the end of the class period when they did the major recall. And that gets to the point about the closeout letter. The FDA issued the closeout letter only after the company had pulled and purged all of its marketing material and only after it had recertified its sales force. Now, a reference has been made to the current stock price, the fact that it's trading in its 30s. It is. In the last month, it's 52 week high repeatedly. What is the news that's generating that? Well, if you look at the announcement from a couple months ago, it's that the company expects approval from the FDA next month or in early March to allow it to market for high-risk PCI. The company, Mr. Minogue specifically, has issued statements in the last few months saying that they expect to have a positive growth to the revenue. Analysts are echoing it, and it's relevant and can be seen in the stock price. So while we said, and the announcement also makes clear that at all prior times, they were not able to market for high-risk PCI, yet they were. All of a sudden, they're allowed to. The market's responding. The defendants are trumpeting it. So that is an important issue, and it goes originally to Judge Selye's question right at the start today. In terms of the issue of this being a highly- So what do we have here, Counsel? We have a moving target. In other words, in reviewing the grant of a motion to dismiss, which took place at a date in the past, you want us to look at current developments in the market, which were not before the district court, in order to support an inference that you think the district court should have ignored. What I'm asking the court to do is look at what has been first alleged in the complaint and the details as we've briefed about the revenue growth and the change in revenue growth that was in the record before. I'm merely pointing out, as Counsel raises the $37 price, the factors that influence it. Thank you, Your Honors. Thank you.